IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JERRICK RENNE BLAND,

    Petitioner,                      2: 10 - cv - 83 - TJB

    vs.

MICHAEL EVANS, Warden

    Respondent.                    ORDER

_____/

## I.  INTRODUCTION

Petitioner is a state prisoner proceeding *pro se* with an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), Petitioner consented in January 2010 to have a United States Magistrate Judge conduct all further proceedings in this case.  Respondent consented in February 2010.

After a jury trial, Petitioner was convicted of inflicting corporal injury and battery causing great bodily injury.  Furthermore, the jury found as true that Petitioner personally inflicted great bodily injury under circumstances involving domestic violence.  Petitioner was sentenced to six years imprisonment.  Petitioner raises two claims in this federal habeas petition; specifically:  (1) the trial court violated his due process rights when it permitted the impeachment of his father with his prior domestic violence convictions ("Claim I"); and (2) the trial court violated Petitioner's equal protection rights when it denied Petitioner probation contrary to the probation

and prosecutor's recommendations ("Claim II").  For the following reasons, the federal habeas petition will be denied.

## II.  FACTUAL BACKGROUND[1]

> The victim recanted at trial, but the evidence, including her pretrial statements, showed defendant beat her severely.
>
> The victim, age 21 at the time of trial, lived with defendant and their daughter, who was almost two years old.  The victim testified she loved defendant.  On the morning of July 14, 2007, she went to the hospital by ambulance, but she testified she was drunk and did not know if she called 911.  She had been at a club the night before with her "brother, an ex-coworker and his wife."  Although she was only 20 years old at the time, her sister let her into the club, where she stayed until closing time, then her brother and his wife took her home.  At the hospital she learned she had "fractured ribs" and chipped teeth.  She received those injuries before her brother took her home.  She testified she was "absolutely positive" she was not injured at home because she was home alone.  She claimed she must have been hurt between the club and the club parking lot by a woman, or else her brother would have intervened.
>
> On cross-examination she changed her testimony, stating "there was some people from there that was from another gang," and when the club closed "the girls was ready to fight me, and my brother was trying to get us out of the club."  Her assailants were women led by "Tay Tay," "from a gang called the Heights."  The victim never told this story before for fear of retaliation.
>
> In a 911 call and at the hospital, the victim said she had been injured by her "baby's daddy," although she said his name was Tyrell Johnson.  She testified the voice on the 911 call was not hers, but the caller used her name, gave her address and telephone number to the operator, described having hurt ribs and being 20 years old, and said her child was at her grandmother's, which is where the victim's child was that night, and was able to answer the operator's questions, that is, was not so drunk as to be unable to carry on a conversation.  The victim testified she did not know anyone named Tyrell Johnson.
>
> A Sacramento County deputy sheriff testified he responded to the victim's apartment at about 6:30 that morning, and "It was pretty obvious that there had been a fight.  The apartment was just trashed."  The victim was not cooperative, but "stated that she was

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District opinion dated June 3, 2009.  Respondent attached this opinion to his answer as Exhibit A (hereinafter "Slip Op.").

sleeping and she was woke[n] up by her boyfriend who was assaulting her by punching her with a closed fist." She said his name was "Jerrick Gray." Eric Grays is defendant's father ("Grays" being his father's last name). Another deputy sheriff testified that that evening, at the hospital, the victim told him that early that morning, "her boyfriend and the father of her child named Jerrick Bland came home and began assaulting her." She told this officer that she first called her father, then called 911. She described her assailant to the officer, and in her testimony she conceded this accurately described defendant.

The victim refused to allow photographs to be taken of her injuries. When a victim advocate called the victim and read out statements attributed to her, she claimed not to know what happened and hung up the telephone.

According to the emergency room doctor, medical records showed the victim arrived at the hospital around 7:30 that morning. No alcohol was found in a sample taken from her at 11:25 that morning. She had "a closed head injury with concussion, left rib fractures, . . . a collapsed lung – and then what we term 'blunt abdominal trauma.'" all of which was attributed in the records to "domestic violence." The victim denied telling anyone that she was assaulted by her "baby's daddy," as the hospital records stated.

The victim testified she was incoherent at the hospital because of morphine she was given, but the emergency room doctor testified she was "oriented" and able to interact with staff, and that she had been given "probably the smallest dose" of morphine for an adult, only two milligrams.

Defendant and his father appeared at the jail that evening, and his father said they were there so defendant could turn himself in "on outstanding domestic violence warrants." When told defendant was not wanted, defendant's father said "No, my son beat on the mother of his baby this morning" and defendant said "Yeah. I need to turn myself in for the domestic violence I did this morning." Neither of them ever referred to *allegations* of violence. Defendant's father did mention he "was concerned with retaliation" from the victim's brothers.

Defendant's father testified and denied he ever said defendant had assaulted the victim, he only said defendant had allegedly assaulted the victim. Grays was impeached with three prior felony convictions for domestic violence. Based on his own experience, Grays testified he knew such cases are treated seriously by the police. Grays testified the victim's father and brothers had vandalized his car because of the alleged assault, explaining he took his son to the police station to avoid further conflict with the victim's family. He testified defendant played football "with North Valley [Lions], [a] semi-pro team." Grays testified he and

defendant waited at the police station *for two hours* until the police concluded defendant should be arrested.

We pause to note that defendant's father's version of events conflicted with the victim's version. She testified her brother had been with her when she was attacked by women outside a bar and he then took her home. If that were true, her brother would have known defendant did not hurt her and her family would have had no reason to retaliate against defendant or his family.

Defendant's nephew testified he was with defendant the day before he was arrested, and woke up with him at their "auntie's house" at around 8:00 that morning, so they could go to Raging Waters. He first told this story to an investigator a couple of months before trial, about nine months after the events described.

Defendant testified he had been playing semi-pro football the day before, then went to a barbecue with his nephew and stayed overnight at his aunt's house, now owned by his cousin. The next morning they were going to Raging Waters, so he went to his apartment between 8:00 and 9:00 a.m., to get a towel. He saw the couch was overturned and the victim was not home, but claimed he was not worried "too much," although he did try to call the victim. His father later called to say defendant was wanted by the police, and told him "I been there before" and it was best to turn himself in. Defendant denied assaulting the victim and denied telling the police he had.

(Slip Op. at p. 2-6 (emphasis in original).)

### III.  PROCEDURAL HISTORY

After Petitioner was convicted and sentenced, he appealed to the California Court of Appeal and raised the issues he raises in his federal habeas petition. The California Court of Appeal affirmed the judgment on June 3, 2009. Petitioner's petition for review to the California Supreme Court was summarily denied on August 12, 2009.

Petitioner filed his federal habeas petition on January 25, 2010. Respondent filed his answer on May 21, 2010.[2] Respondent filed a traverse on October 5, 2010.

//

---

[2] In his traverse, Petitioner argues that Respondent's answer was untimely as it was filed on May 25, 2010, after the May 21, 2010 deadline previously extended by the court. Petitioner is mistaken. A review of the docket indicates that Respondent's answer was filed on May 21, 2010. Respondent then served Petitioner with a copy of the answer on May 25, 2010.

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  See 28 U.S.C. 2254(d).

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly

established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents."). In this case, the last reasoned court decision was from the California Court of Appeal on direct appeal.

## V. ANALYSIS OF PETITIONER'S CLAIMS

A. Claim I

In Claim I, Petitioner argues that his due process rights were violated when the trial court allowed his father to be impeached with his prior domestic violence convictions. The California Court of Appeal analyzed this Claim as follows:

> Defendant contends the trial court should have sanitized his father's prior convictions, so the jury would not learn that his father had been convicted of domestic abuse. In part he also contends the trial court failed to engage in an appropriate balancing test. We disagree with these contentions.
>
> The prosecutor moved in limine in part to impeach Grays, defendant's father, with three felony convictions, one domestic violence conviction (§ 273.5) and another case in which he was convicted of domestic violence (ibid.) and felony assault (§ 245, subd. (a)(1)).
>
> The defense filed a counter-motion to sanitize the domestic violence convictions, so the jury would not "impute the sins of the father to the son."
>
> At the hearing, the prosecutor argued the father's experience with domestic violence was relevant because it tended to show he would not have told the police his son had committed such violence unless it had actually occurred, and he knew the police would take the case seriously, further, the prosecutor was not going to argue "the apple doesn't fall [far] from the tree" to suggest to the jury to conclude defendant was an abuser because his father had been an abuser. Defendant's trial counsel continued to argue that the jury would impute "the sins of the father onto the son."
>
> After considering the argument, including the defense view of Evidence Code section 352, the trial court denied the request to sanitize the priors.
>
> At trial Grays testified he had been convicted of felony spousal abuse in 2003, and in 1995 was convicted of two felonies in another "domestic violence" case.

6

On appeal, defendant first argues the trial court failed to weigh the appropriate factors to determine whether the evidence was more prejudicial than probative under Evidence Code section 352. We disagree. A trial court need not state its analysis on the record. The trial court considered the written and oral arguments presented by the parties and then made its ruling. The "record as a whole thus shows the trial court undertook a weighing of the probative value and the prejudicial effect of the evidence in making its ruling." (People v. Hinton (2006) 37 Cal.4th 839, 892.) That is sufficient.

On the merits, we cannot say the trial court abused its discretion. There is no claim that these priors were too remote, and defendant does not dispute that they reflect moral turpitude. (See People v. Rodriguez (1992) 5 Cal.App.4th 1398, 1402.) In considering the prejudice that may result from impeachment with priors, a relevant fact is that *defendant* was not impeached, his father was. Although any witness may be impeached with prior convictions (Evid. Code, § 788) the fact a prior is used to impeach a witness, rather than the defendant, generally lessens the possibility of prejudice to the defendant. The prosecutor did not argue that the sins of the father should be laid at defendant's feet, and we do not agree with the defense view that the jury would draw such an inference.

The trial court had the discretion to sanitize or exclude the priors. (See, e.g., People v. Sandoval (1992) 4 Cal.4th 155, 177-178 [offer to sanitize defendant's prior proper]; People v. Feaster (2002) 102 Cal.App.4th 1084, 1093-1094 [proper to exclude prior of prosecution witness].) But because there was no rational basis to conclude the priors would prejudice *defendant*, and because they reflected on his father's credibility, or lack of credibility, we cannot say the trial court abused its discretion.

Moreover, it is not reasonably probable that defendant would have been acquitted had his father's priors been sanitized. (See People v. Cudjo (1993) 6 Cal.4th 585, 611-612 [misapplication of Evid. Code § 352 subject to state law, harmless error standard].) Despite the victim's testimony seeking to exonerate defendant, no rational jury would have believed her. Her inexplicable denial of the 911 call she made, and her multiple fresh statements inculpating defendant, as well as the implausible and uncorroborated "Tay Tay" explanation for her injuries, in which her brother allowed her to be beaten at a club and then left her at home with severe injuries, made her testimony incredible. Her refusal to cooperate, such as by refusing to allow her injuries to be photographed and hanging up on the victim advocate, as well as her testimony that she loved defendant, showed her bias. Defendant's unusual act of waiting for two hours at a police station, quite apart from his inculpatory statement at the station, tends to belie his claim of innocence. An innocent man would likely have rushed to the hospital to be with

the victim. Taken as a whole, the evidence was overwhelming. Therefore, any error in failing to sanitize defendant's father's priors was harmless.

(Slip Op. at p. 6-9.)

First, to the extent that Petitioner argues that the state court misapplied California Evidence Code § 352[3] and thereby misapplied state law, his claim is not cognizable in these federal habeas proceedings. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). For example, Petitioner argues in his federal habeas petition that the state court erred by not properly expressly balancing the probative value of Petitioner's father's prior crimes versus its prejudicial effect. This is a state law claim and is not cognizable on federal habeas review.[4]

A state court's "evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of a fundamentally fair trial guaranteed by due process." See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) (citations omitted). Habeas relief may be granted on if there are no permissible inferences that the jury may draw from the evidence. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Additionally, in order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993). Petitioner would have to show that the error had "'a substantial and injurious effect on the verdict." See id. at 623.

To the extent that Claim I does raise a cognizable federal habeas claim, he failed to show

---

[3] California Evidence Code § 352 states that, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing of the issues, or of misleading the jury."

[4] Furthermore, it is worth noting that the trial court engaged in extensive arguments pre-trial regarding the issue of Petitioner's father's priors. Both sides were able to present their positions as to whether the evidence should be excluded or admitted under California Evidence Code § 352. (See Reporter's Tr. at p. 11-19.)

8

that he was entitled to federal habeas relief.  First, the prosecutor sought to admit Mr. Grays' prior crimes as it related to his conduct in bringing Petitioner to the jail and his subsequent statements upon their arrival at the jail regarding Petitioner's domestic violence.  The prosecutor was not seeking to admit the prior crimes on an "apple does not fall far from the tree" theory.[5] (See Reporter's Tr. at p. 12.)  As the prosecutor noted to the trial court with respect to Mr. Grays priors crimes:

> The fact that it's a domestic violence case is pertinent not because of the argument that defense counsel has put forth that somehow the apple doesn't fall from the tree argument is pending, but more so that an individual with Mr. Grays' experience as a three time, I believe, spousal abuser,, at least to – would know better than to say something like that to police officers at the jail if, in fact, he hadn't occurred.
>
> Okay.  It's obviously an important issue that he has experience and knowledge about these types of cases.  So, you know, again, I don't intend to argue that because his father did it, he did it.  And it's not one that I ever intended on making.
>
> I only intend to argue these priors as it relates to Mr. Grays and both his statements and conduct.  So I am asking the Court to allow me to impeach him with them and probe into the fact that he made the statements that he made knowing what the result of those statements would be.

(Reporter's Tr. at p. 13-14.)  Thus, there was at least a permissible inference that the jury could draw from this evidence such that it does not amount to a due process violation.

Additionally, even if there was error in admitting this testimony, such error was harmless under the Brecht standard.  As noted by the California Court of Appeal, the victim provided contemporaneous statements to the police soon after she was beaten which implicated Petitioner

---

[5] Petitioner argues that admitting his father's prior crimes was not harmless as the trial court indicated at sentencing that domestic violence runs in families.  (See Pet'r's Pet. at p. 15.) Upon reviewing the sentencing hearing transcript it appears as if Petitioner's summary of the trial judge's comments at sentencing are inaccurate.  Second, Petitioner asserts that statements by the trial judge at sentencing indicate that the error was not harmless.  Obviously, any statements made at sentencing could not have a substantial and injurious effect on the *jury's* verdict such that Petitioner would not be entitled to federal habeas relief.

9

as her attacker. (See Reporter's Tr. at p. 231 ("She stated that she was sleeping and she was woke up by her boyfriend who was assaulting her by punching her with a closed fist."); p. 231-32 (giving the name of her attacker to police as "Jerrick Gray"); p. 257 ("She told me that on the morning in question, she had come home from a club at about 2:30 a.m. She told me that she fell asleep on the couch, and when she woke up at about 3:30 a.m., her boyfriend and the father of her child named Jerrick Bland came home and began assaulting her.").) Furthermore, evidence in the record strongly implicated Petitioner when he turned himself into police. For example, Petitioner's father told Greg Biela who was working at the Sacramento jail that he was there to turn in Petitioner for an outstanding domestic violence warrant. (See id. at p. 331.) The following colloquy took place between Mr. Biela and the prosecutor on direct:

> Q: So when you told Mr. Grays that you would not be taking Mr. Bland into custody on the two traffic warrants, what was his response?
> A: Can I refer to my report?
> Q: If that will refresh your recollection, please do so.
> A: Thank you. [¶] When I told him that I would not take him into custody, Mr. Grays said, "No, my son beat on the mother of his baby this morning." And then Mr. Bland said, "Yeah, I need to turn myself in for the domestic violence I did this morning."
> Q: Okay. I notice in your report you have Mr. Grays saying, "No my son beat on the mother of his baby this morning" in quotes?
> A: Correct.
> Q: Why is that in quotes?
> A: It would be a direct quotation.
> Q: Okay. Did you write that down?
> A: Yes, I did.
> Q: Some form of notes?
> A: Yes.
> Q: Did you use those notes to make this report?
> A: Yes, I did.
> Q: And then you destroyed your notes and submitted your report?
> A: Yes, I did.
> Q: Okay. Same thing with what Mr. Bland said, "Yeah, I want to turn myself in for the domestic violence I did this morning," that's also in quotes?
> A: Yes.
> Q: Is that also a direct quote?
> A: Yes, it is.
> Q: Okay. At any time did Mr. Grays or Mr. Bland ever say, *it's only an allegation, he didn't do it?*
> A: No.

10

> Q: Did they ever tell you, *look, we never – he didn't do it, but some people are saying he did it so we want to clear this up?*
> A: No, never said that.
> Q: Neither Mr. Grays or Mr. Bland said that?
> A: Nobody said that.
> Q: Okay. Did you ask Mr. Bland who the victim was?
> A: Yes, I did.
> Q: What did he say?
> A: Um, he said that the victim was the mother of his baby, Stella Mars, and that she had been taken to UC Davis Medical Center.
> Q: Okay. Is it uncommon for people to come to the jail and attempt to turn themselves in on warrants that don't exist?
> A: Very unusual. Generally if somebody comes in to turn themselves in on a warrant and we tell them, no, we're not going to take you, you don't have a warrant, or it's so minor we won't take you, they're out the door faster than I can get anything else out.
> Q: So this was an unusual situation?
> A: Very unusual.

(Reporter's Tr. at p. 332-34.)

The evidence produced at trial strongly implicated Petitioner as the attacker. Thus, any purported error in admitting the father's prior crimes was harmless under these circumstances. Petitioner has failed to show that he is entitled to federal habeas relief on Claim I.

B. Claim II

In Claim II, Petitioner argues that his constitutional rights were violated when the trial court denied him probation and sentenced him to six years rather than five years imprisonment. The California Court of Appeal analyzed this Claim as follows:

> Defendant contends the trial court should have granted probation. We disagree with this contention.
>
> Because the jury found defendant inflicted great bodily injury, he was ineligible for probation unless the court found this was an unusual case. (§ 1203, subd. (e)(3).)
>
> The probation officer filed a report recommending probation based on defendant's youth (age 22), lack of criminal record, willingness to comply with probation terms, and the fact the victim did not want him to go to prison. At sentencing, the victim stated she wanted defendant's help in raising their child, and reiterated that defendant had no record. The prosecutor argued for the lower term, or a 90-day diagnostic evaluation, and the defense attorney argued for probation.

11

The trial court rejected the probation officer's recommendation.  In part the court stated that at age 22, defendant had no excuse for beating his companion "almost to death" and that the victim's plea for lenity was typical of domestic abuse victims and did not show that this was an unusual case; instead, defendant would present a continuing threat to her and to their child.  The court imposed the midterm of three years enhanced by three years for the great bodily injury allegation.

California Rules of Court, rule 4.413(c)(2)(c) provides in part that a defendant's youth and lack of a record are factors a trial court *may* use to determine that a case is unusual for purposes of considering whether to grant probation.  But the existence of factors that *may* justify finding a case unusual does not compel such a finding.  (People v. Stuart (2007) 156 Cal.App.4th 165, 178.)  On appeal, we review the trial court's decision with deference, that is, we will not reverse simply because the question was debatable; the defendant must show that the trial court abused its discretion.  (Id. at pp. 178-179.)

In the context of sentencing decisions, the California Supreme Court has clarified what an "abuse of discretion" is, and what it is not:  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'"  [Citations.]  Second, a "'decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"'  [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (People v. Carmony (2004) 33 Cal.4th 367, 376-377.)

Defendant, who played semi-pro football, beat the then-20-year-old mother of his child, causing a concussion, broken ribs, broken teeth, a collapsed lung and blunt force trauma to her abdomen.  In a case with such severe injuries, we cannot say the trial court abused its discretion in declining to find that this was an unusual case based on defendant's age and lack of a criminal record.

The victim's desire to have defendant help her raise their child does not change our view.  She recanted at trial, showing that her affection for defendant had led her to misjudge the danger he poses to her, and perhaps to their child.  As the trial court stated at sentencing, "What's needed here is not leniency for defendant.  What's needed here is counseling for the victim for her to

> understand that to protect defendant in this case, even to the extent of breaking the law by dishonoring her vow to tell the truth, does nothing but allow the cycle of domestic violence to continue. To have her own daughter raised in an environment like that, to be subject to that, to be shown that this is how fathers treat mothers would be unconscionable in our society." We find no abuse of discretion in this view.
>
> Within the portion of the opening brief arguing the denial of probation was an abuse of discretion, defendant suggests a five-year sentence was appropriate, inferentially arguing the trial court should have selected the lower term of two years and then added three years for the great bodily injury enhancement. The point was not properly headed, and it is not supported by adequate legal analysis; therefore, if it was intended to be a separate contention on appeal, it si forfeited. (See *In re S.C.* (2006) 238 Cal.App.4th 396, 408.)

(Slip Op. at p. 9-12.)

Habeas corpus relief is unavailable for alleged errors in the interpretation or application of state sentencing laws by either a state trial court or a state appellate court. See Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1999). So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). State law errors in the application of state sentencing laws do not warrant federal habeas relief. See, e.g., Miller v. Vasquez, 868 F.2d 1116 (9th Cir. 1989) (refusing to address whether assault with a deadly weapon qualifies as a serious felony under California's sentence enhancement as that is a question of state sentencing law).

In Estelle, 502 U.S. at 68, the United States Supreme Court reiterated that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." It emphasized that "federal habeas corpus relief does not lie for error in state law." Id. at 67 (citations omitted). Thus, Petitioner's argument of sentencing error does not state a federal claim. See, e.g., Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998) (stating that review is "only for constitutional violation, not for abuse of discretion"); Langford v. Day, 110 F.3d

1380, 1389 (9th Cir. 1996) (stating that petitioner cannot "transform a state-law issue into a federal one merely by asserting a [constitutional] violation").

Petitioner also fails to show that his sentence was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation.  See, e.g., Richmond v. Lewis, 506 U.S. 40, 50 (1992) (setting forth applicable federal habeas standard on sentencing issue).  Petitioner was sentenced to the middle term of three years for his crime along with a corresponding three-year enhancement pursuant to the applicable state statutes.  Thus, Petitioner fails to show a Federal Constitutional violation with respect to his six-year sentence.  Therefore, he is not entitled to federal habeas relief on Claim II.

## VI.  PETITIONER'S REQUESTS

### A.  Order to Show Cause

Petitioner requests an order to show cause.  Respondent answered the petition on May 21, 2010.  Therefore, this request will be denied as moot.

### B.  Evidentiary Hearing

Petitioner also requests an evidentiary hearing.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for the reasons stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim for federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated

the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011). Thus, his request will be denied.

### C. Appoint Counsel

Finally, Petitioner requests the appointment of counsel. There currently exists no absolute right to the appointment of counsel in habeas proceedings. See, e.g., Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996). However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require." In the present case, the interests of justice do not so require to warrant the appointment of counsel. Accordingly, Petitioner's request for the appointment of counsel is denied.

## VII.  CONCLUSION

For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief. Should petitioner wish to appeal to appeal the court's decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement. 28 U.S.C. § 2253(c)(3).

A certificate of appealability should be granted for any issue that petitioner can demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different court, or is "'adequate to deserve encouragement to proceed further.'" Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). In this case, however, Petitioner failed to make a substantial showing of the denial of a constitutional right with respect to any issue presented.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's request for an order to show cause is DENIED AS MOOT;

2. Petitioner's request for an evidentiary hearing is DENIED;

3. Petitioner's request for the appointment of counsel is DENIED;

4. Petitioner's Petition for writ of habeas corpus is DENIED;

5. A certificate of appealability shall not issue; and

6. The Clerk is directed to close this case.

DATED: August 16, 2011

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE